JUDGE FURMAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

IMMUNOVATIVE, INC.,

          Plaintiff,

v.

IMMUNOVATIVE THERAPIES, LTD.,

          Defendant.

-------------------------------------------------------X

Civil Action No. 13 CV 0386

**COMPLAINT**

RECEIVED JAN 16 2013

    Plaintiff Immunovative, Inc. ("Immunovative") f/k/a Novo Energies Corporation, for its complaint against defendant Immunovative Therapies, Ltd. ("ITL"), alleges through its undersigned counsel as follows:

### Nature of the Action

    1.    This is an action for breach of contract and a constructive trust arising out of ITL's wrongful termination of the License Agreement dated December 12, 2011 between Immunovative and ITL ("License Agreement") and ITL's wrongful taking of Immunovative's $3.7 million license payment. A true and correct copy of the License Agreement is attached hereto as Exhibit A.

    2.    As described in greater detail below, the License Agreement calls for Immunovative to raise money for ITL for the development of ITL's cancer drugs, and then for Immunovative to share in the revenue derived from these technologies by sublicensing them and ultimately receiving 25% ownership of an entity that would own ITL and its patent rights through a merger transaction.

    3.    ITL and Immunovative had a confidential relationship, agreeing to work jointly together in the spirit of partnership to obtain regulatory approval and market one or more products for the treatment of cancer, and agreeing to merge the two companies together into a

single entity.

4. Immunovative fully performed on the parties' agreement, by raising money for ITL's cancer drugs and making approximately $3.7 million in payments to ITL well in advance of the License Agreement's payment schedule.

5. ITL, on the other hand, has willfully breached and repudiated the License Agreement by unilaterally revoking the agreement without any basis to do so.

6. Indeed, ITL is attempting to keep the approximately $3.7 million that Immunovative paid, while denying Immunovative any of the benefits it is entitled to receive under the agreement – namely the ability to earn sublicensing fees and to receive 25% ownership of ITL's patent rights.

7. The remedy for such a repudiation and breach is clear. Immunovative is entitled to recoup the approximately $3.7 million it paid ITL, plus statutory interest and costs.

8. Further, in the alternative, ITL's wrongful taking of Immunovative's payments requires that ITL's intellectual property rights and scientific work that Immunovative has funded be held in constructive trust for Immunovative's benefit.

9. In addition, Immunovative also seeks an accounting of ITL's use of Immunovative's funds and the value of its patent rights and shares; a declaratory judgment; and damages based on ITL's breach of Section 10.5 of the License Agreement.

## Jurisdiction and Venue

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. ITL has by contract consented to the personal jurisdiction of "the courts located in New York, New York." Exhibit A, License Agreement Section 11.1.

12. Venue is proper in this judicial district under 28 U.S.C. § 1391. Under the terms

and conditions of the License Agreement, ITL expressly consented to the venue of "the courts located in New York, New York." Exhibit A, License Agreement Section 11.1.

## Parties

13. Plaintiff Immunovative is a public Florida corporation with its principal place of business in Danbury, Connecticut. Immunovative raises capital for, develops and commercializes innovative biological drug products and treatment protocols for the fight against cancer.

14. Defendant ITL is a private Israeli biopharmaceutical company headquartered in Jerusalem, Israel. ITL develops novel immunotherapy drug products that incorporate living immune cells as the active ingredients for treatment of cancer and infectious disease.

## Factual Background

### I. The License Agreement

15. Immunovative and ITL entered into a License Agreement, effective December 12, 2011.[1]

16. By its terms, the License Agreement is governed by and is to be construed in accordance with the laws of the State of New York. Exhibit A, License Agreement Section 11.1.

17. Throughout the term of the License Agreement, Immunovative was responsible for fund raising, business development, contract negotiations for sublicensing, investor and public relations, financial reporting and other regulatory compliance issues for public companies. Exhibit A, License Agreement Section 2.7.

18. ITL was responsible for, among other things, the continued research and development of the Licensed Products, the conduct of the Clinical Trial, manufacturing, formation, packaging and shipping of any Licensed Products, patent prosecution and regulatory filings with the FDA or other regulatory bodies. Exhibit A, License Agreement Section 2.8.

19. Immunovative and ITL had a confidential relationship, sharing the desire to "work jointly together in a spirit of partnership" and agreeing to use "best efforts" and "collaborate" to achieve U.S. and international regulatory approvals. Exhibit A, License Agreement p. 1, Section 5.1.

20. Immunovative also had the right to sublicense its rights and/or obligations under the License Agreement to one or more third parties ("Sublicensee") and earn fees and royalties from such sublicenses. Exhibit A, License Agreement Section 2.2.

21. In order to raise funds and launch their "envisioned joint efforts," ITL granted to Immunovative an exclusive and worldwide license to commercialize any products covered under ITL's current issued and pending patent application portfolio, as well as the rights to any future patent applications.

22. In exchange for the license, Immunovative agreed to pay ITL $10 million over time, from the Effective Date of the License Agreement until the date that is two years after receiving notice from a regulatory agency in the U.S., Canada, European Union or Thailand of approval to commence a Phase II/III clinical trial ("Regulatory Notice").

23. The $10 million due from Immunovative under the License Agreement was to be paid in accordance with the following schedule: (1) an "Upfront Payment" of $450,000 on the Effective Date of the Agreement; (2) "Minimum Monthly Payment" of $150,000 at the start of each month, beginning on the later of (i) 90 days after the effective date, or (ii) after ITL submits to a peer-reviewed journal a manuscript for publication describing the results of the Phase I/II clinical trial conducted pursuant to IND 13,9361 until the $10 million has been paid; (3) "Clinical Trial Payment" of $2 million within 90 days of receiving Regulatory Notice; and (4) prepayment of any portion of the $10 million at any time that Immunovative chose prior to the dates above. Exhibit A, License Agreement Section 3.2.

---

[1] All capitalized terms not defined herein shall have the meanings ascribed thereto in the License Agreement.

24. Section 3.2.5 of the License Agreement provides that although payments can be made at any time, the intent of the Agreement is that the Licensee shall endeavor to pay the License Cost "as soon as practical during the Period."

25. The principal reward for Immunovative's fund raising efforts and payments was the ability to earn sublicensing fees, including monthly fees and royalties, on any sublicenses it entered into. Exhibit A, License Agreement Section 2.2.3.

26. An additional benefit to Immunovative was the agreed upon merger of ITL and Immunovative that was scheduled to occur after the Clinical Trial of ITL's drugs.

27. Specifically, in consideration for Immunovative's performance (including its license payments), ITL and Immunovative agreed to consummate a merger transaction in which they would become a single entity with ITL owning 75% of the post-merger shares and Immunovative owning 25% of the post-merger shares on a fully diluted basis. Exhibit A, License Agreement Section 4.1.

28. The License Agreement also provides a clear process for addressing a claimed failure by Immunovative to make a timely payment in accordance with the payment schedule.

29. Section 10.3 of the License Agreement provides for Termination Due to Breach:

> In the event of a material breach of this Agreement by either party, the other has the right to terminate this Agreement by providing thirty (30) days advance written notice to the breaching party, specifying the act or omission on which such termination is based. If the breaching party cures the breach within the thirty (30)-day advance notice period, this Agreement will remain in force. The thirty (30) day period will commence on the day that the breaching party receives the notice.

Exhibit A, License Agreement Section 10.3.

30. Section 10.3.1 allows the Licensee to cure a payment breach by paying the amount due plus a penalty payment equivalent to a 12% annual rate of the amount due within the thirty-day advance notice period. Exhibit A, License Agreement Section 10.3.1.

5

31.     Immediate termination by either party is allowed, but solely to avoid "irreparable harm." For example, the License Agreement contemplates that the Licensor may immediately terminate the License Agreement in the event of breach of any obligation of confidentiality; infringement, misappropriation, or misuse of any intellectual property rights of the Licensor; or bankruptcy, insolvency, or other similar condition of the Licensee. Exhibit A, License Agreement Section 10.3.2.

32.     The License Agreement's provision allowing immediate termination in the case of irreparable harm does not apply where there is a dispute about the timing or amount of payments due under the License Agreement.

33.     Finally, the License Agreement contains an exclusivity clause which states:

> Licensee agrees, **throughout the term of this Agreement**, to exclusively engage in business activities related to performing its obligations under this Agreement, particularly raising the required funds for the conduct of the Clinical Trial and thereafter, the Commercialization of the Licensed Products. As such, Licensee will not engage, whether directly or indirectly, **throughout the term of this Agreement** in any other business activity, including the in-licensing of technology or products from a third party or otherwise acquire technology or products for development or sale from a third party without the prior written permission of the Licensor.

Exhibit A, License Agreement Section 2.7 (emphasis added).

**II.     Immunovative's Performance Under the License Agreement**

34.     As noted above, Immunovative's principal obligation under the License Agreement is to raise money for the development of ITL's cancer drugs and to make its license payments in accordance with Section 3.

35.     To date, Immunovative has raised substantial funds and paid ITL approximately $3.7 million, $3.25 million of which was paid in advance of the deadlines in the License Agreement.

36.     Immunovative made the "Upfront Payment" of $450,000 in accordance with

Section 3.2.1 of the License Agreement.

37. The Minimum Monthly Payment set forth in Section 3.2.2 was not required because ITL never submitted a manuscript describing the results of the Phase I/II clinical trial to a peer review journal for publication.

38. Immunovative pre-paid the Clinical Trial Payment of $2 million in accordance with Section 3.2.3.

39. By email dated November 28, 2012, ITL's CEO Dr. Michael Har-Noy purported to provide Immunovative with a claimed Regulatory Notice from the Ministry of Public Health of Thailand to conduct the Clinical Trial.

40. Immunovative is not currently in the position to confirm whether this notice is a Regulatory Notice under Section 3.2.3 of the License Agreement.

41. Assuming that Dr. Har-Noy's November 28 email constituted Regulatory Notice under Section 3.2.3, Immunovative's Clinical Trial Payment would be due February 26, 2013. Immunovative reserves its right to dispute whether this notice is a proper Regulatory Notice under the License Agreement.

42. Immunovative also made "Additional Payments" of at least $1.25 million in accordance with Section 3.2.4.

**III.   ITL's Breach of the License Agreement**

43. Despite these payments and Immunovative's full performance, ITL recently unilaterally revoked the License Agreement.

44. By letter dated January 8, 2013, entitled "Notice of Termination of License Agreement," ITL "terminated, cancelled [and] revoked" the License Agreement citing Section 10.3.2. A true and correct copy of Dr. Har-Noy's January 8, 2013 Notice of Termination is attached hereto as Exhibit B.

45. ITL's notice asserted that it was made with "immediate effect," and ITL revoked

Immunovative's right to use any of ITL's intellectual property, including the name "Immunovative."  Exhibit B, Notice of Termination, p. 4.

46.   In its Notice of Termination, ITL made clear that it had no intention of further performing any of its obligations under the License Agreement and that ITL considers the License Agreement to be "null and void and without further force or effect."  Exhibit B, Notice of Termination, p. 1.

47.   This termination was wrongful and is itself a repudiation and substantial breach of the License Agreement.

48.   None of the asserted "material breaches" ITL cited in its Notice of Termination are grounds to terminate the License Agreement.

49.   The Notice of Termination cites as "Material Breach #1" the purported failure to make a minimum payment of $2 million within ninety days of receiving "Regulatory Notice to Conduct the First Clinical Trial."  Exhibit B, Notice of Termination, p. 1-2.  However, as described above, Immunovative prepaid the $2 million Clinical Trial Payment, and has fully complied with the License Cost payment schedule set forth in the License Agreement.

50.   The Notice of Termination cites as "Material Breach #2" the argument that an additional $2 million must be paid for the Thailand clinical trial, even though Immunovative prepaid this amount.  Exhibit B, Notice of Termination, p. 2-3.  No additional funds are currently due under the License Agreement.

51.   The Notice of Termination cites as "Material Breach #3" a loan for $172,364 made to Immunovative's former Chief Executive Officer on January 21, 2010.  The loan was paid in full by August 2, 2012, as noted in the Notice of Termination.  Exhibit B, Notice of Termination, p. 3.  In any event, this loan could not be a material breach under the License Agreement.

52.   The alleged "Material Breaches" cited in the Notice of Termination are

8

groundless. As such, ITL has materially breached and repudiated the License Agreement by wrongfully terminating it.

53.     ITL has further breached the License Agreement by, among other things, failing to honor the "notice of breach" provision of Section 10.3 of the License Agreement (calling for thirty days advance written notice) and the "equity upon termination" provision of Section 10.5 of the License Agreement (calling for issuance of ordinary shares to Immunovative).

54.     As a result of ITL's wrongful termination, the license granted to Immunovative is revoked and of no further force and effect.

### IV.     ITL's Post-Termination Conduct

55.     Following ITL's termination of the License Agreement, ITL intends to retain Immunovative's approximately $3.7 million in License Payments to fund its research and development efforts.

56.     In addition, upon information and belief, ITL intends to solicit funds directly from Immunovative's investors and business contacts.

57.     Indeed, On January 9, 2013, Dr. Har-Noy contacted one of Immunovative's investors and explained that he terminated the License Agreement, and that ITL is now independently raising funds for the Thailand clinical trial.

58.     It is clear that ITL intends to keep Immunovative's funds in order to continue its research and development, while denying Immunovative of any benefit it is entitled to receive under the License Agreement.

### First Claim for Relief
### (Breach of Contract)

59.     Immunovative repeats and incorporates the allegations in paragraphs 1 through 58 as if set forth fully herein.

60.     The License Agreement between ITL and Immunovative executed on December

12, 2011 was a valid and enforceable contract.

61. Immunovative performed all of its obligations under the License Agreement.

62. ITL refused to perform its obligations by, among other things, wrongfully terminating the License Agreement.

63. ITL has repudiated the License Agreement, including by sending the Notice of Termination.

64. As a direct and proximate result of ITL's breach, Immunovative has suffered damages in an amount to be determined at trial, but in any event, no less than $3,700,000.00 plus interest, fees and costs.

## Second Claim for Relief
### (Constructive Trust)

65. Immunovative repeats and incorporates the allegations in paragraphs 1 through 64 as if set forth fully herein.

66. ITL and Immunovative have a confidential relationship as a result of their agreement to work jointly together to develop ITL's cancer drugs and to merge their two companies to make a single entity.

67. Both ITL and Immunovative promised to make best efforts to accomplish their envisioned joint goals.

68. In reliance on ITL's representations, Immunovative transferred approximately $3.7 million to ITL.

69. ITL refused to perform its obligations by, among other things, wrongfully terminating the License Agreement.

70. ITL has not returned Immunovative's funds.

71. Upon information and belief, ITL continues to use Immunovative's funds in its development of cancer drugs, and has benefited from the use of these funds to Immunovative's

detriment.

72.     Accordingly, Immunovative is entitled to a constructive trust over ITL's intellectual property rights and scientific work to prevent ITL's unjust enrichment from its wrongful retention of Immunovative's $3.7 million.

### Third Claim for Relief
(Accounting)

73.     Immunovative repeats and incorporates the allegations in paragraphs 1 through 72 as if set forth fully herein.

74.     ITL and Immunovative have a mutual and confidential relationship given their promise to work jointly together to develop ITL's cancer drugs.

75.     Immunovative paid ITL approximately $3.7 million under the terms of the License Agreement.

76.     ITL refused to perform its obligations by, among other things, wrongfully terminating the License Agreement.

77.     ITL has not returned Immunovative's funds.

78.     Immunovative has demanded an accounting and ITL has refused to provide one.

79.     Immunovative seeks an accounting of ITL's receipt of Immunovative's funds, how ITL has used Immunovative's funds, the value of ITL's patent rights and other technology, and the value of ITL, including of its shares.

### Fourth Claim for Relief
(Declaratory Judgment)

80.     Immunovative repeats and incorporates the allegations in paragraphs 1 through 79 as if set forth fully herein.

81.     There is a real dispute between ITL and Immunovative involving substantial legal interests for which a declaration of rights will have some practical effect.

82.     An actual controversy exists with respect to Immunovative's exclusivity

obligations under the License Agreement as a result of ITL's wrongful termination.

83. Immunovative will be harmed if, among other things, its obligations pursuant to the License Agreement are not established and enforced.

84. By reason of the foregoing, Immunovative seeks a declaratory judgment that the License Agreement has been terminated and it is null and void, and that Immunovative is no longer bound by the License Agreement's exclusivity provision contained in Section 2.7.

### Fifth Claim for Relief
### (Breach of Contract)

85. Immunovative repeats and incorporates the allegations in paragraphs 1 through 84 as if set forth fully herein.

86. ITL wrongfully terminated the License Agreement on January 8, 2013.

87. Under Section 10.5 of the License Agreement, ITL is obligated upon termination to convert all funds paid by Immunovative into equity and to issue ordinary shares.

88. ITL has not complied with this provision.

89. In addition to an award of compensatory damages and other relief, Immunovative is entitled to receive ordinary shares of ITL's stock pursuant to Section 10.5 of the License Agreement, in the same proportional value as the shares would have had at the time of the Merger in Section 4 of the License Agreement.

### Jury Demand

90. Plaintiff requests a trial by jury of all issues so triable.

### Request for Relief

WHEREFORE, Plaintiff Immunovative prays for relief and respectfully requests that the Court enter judgment in its favor as follows:

(a)   Compensatory damages in an amount proven at trial;

(b)   Punitive damages;

(c) A constructive trust on ITL's intellectual property and scientific work;

(d) An accounting by ITL of ITL's receipt of Immunovative's funds, how ITL has used Immunovative's funds, the value of ITL's patent rights and other technology, and the value of ITL, including of its shares;

(e) A declaration that ITL terminated the License Agreement, that such termination was wrongful, and that Immunovative is no longer bound by the License Agreement's exclusivity provision;

(f) Attorneys fees and costs;

(g) Pre- and post-judgment interest at the maximum lawful rate; and

(h) Such other and further relief as the Court deems just and proper.

Dated: New York, New York
January 16, 2013

IMMUNOVATIVE, INC.

By: /s/ Luke A. Connelly
Luke A. Connelly
Lauren E. Cuneo

WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
lconnelly@winston.com
lcuneo@winston.com

Kimball R. Anderson
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
kanderson@winston.com

*Attorneys for Plaintiff Immunovative, Inc.*